BWB:MTK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

1ᴜ MISC 1980

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
IN THE MATTER OF AN APPLICATION OF     :
THE UNITED STATES OF AMERICA FOR AN    :     **TO BE FILED UNDER SEAL**
ORDER REAUTHORIZING THE DISCLOSURE :
OF LOCATION DATA RELATING TO A         :     AFFIDAVIT IN SUPPORT OF
SPECIFIED WIRELESS TELEPHONE           :     WARRANT APPLICATION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

       I, Gino X. Izzo, being first duly sworn, hereby depose and state as follows:

       1.     I make this affidavit in support of an application for a search warrant

under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for

information about the prospective location of (347) 589-1191 (the "SUBJECT

TELEPHONE"), which is being used by the TARGET SUBJECT of an investigation, whose

identity has yet to be discovered, and whose wireless telephone service provider is T-Mobile

USA, Inc. ("Service Provider"). The SUBJECT TELEPHONE is described herein and in

Attachment A, and the prospective location information to be seized is described herein and

in Attachment B.

       2.     I have been a Task Force Officer with the Drug Enforcement

Administration (the "Investigating Agency") since July 2009. I have been assigned to

investigate violations of criminal law relating to narcotics trafficking. These investigations

are conducted both in an undercover and overt capacity. I have participated in investigations

involving search warrants and arrest warrants. As a result of my training and experience, I

am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other Task Force Officers, agents and witnesses.  Because the purpose of this affidavit is limited to demonstrating probable cause for the requested warrant, it does not set forth all of my knowledge about this matter.  In addition, when I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

4.     For the reasons set forth below, I respectfully submit that probable cause exists to believe that the requested information will lead to evidence of the crime(s) of distribution and possession with the intent to distribute controlled substances in violation of Title 21, United States Code, Section 841 and conspiracy to do the same in violation of Title 21, United States Code Section 846 (the "Subject Offenses"), as well as the identification and location(s) of the TARGET SUBJECT who is engaged in the Subject Offenses.

## FACTS ESTABLISHING PROBABLE CAUSE

5.     I have been involved in an investigation regarding the distribution of Oxycodone tablets in the metropolitan New York and New Jersey areas.

6.     In connection with that investigation, since on or about June 1, 2015, Task Force Officers have spoken with an individual who is a confidential source ("CS-1") for law enforcement.  CS-1 has worked with the Investigating Agency since approximately January 2015 and provided reliable information in the past seven months.

7.     CS-1 knows a target of the investigation, MICHAEL GIBBARD, to be a narcotics dealer. On or about June 8, 2015, CS-1 informed Task Force Officers that he/she had recently spoken with individuals known to GIBBARD at a gym in Queens, New York. During their conversation, the individuals known to GIBBARD informed CS-1 that the he was in possession of approximately 6,000 pills of Oxycodone.

8.     On or about June 11, 2015, CS-1 positively identified GIBBARD in a photo array.

9.     On or about June 29, 2015, CS-1 spoke with GIBBARD at the aforementioned gym in Queens, New York. GIBBARD asked CS-1 if he/she had any interest in purchasing Oxycodone pills. CS-1 stated that he/she was interested in purchasing the pills. GIBBARD informed CS-1 that he would provide CS-1 with a sample the next time they encountered each other at the gym.

10.     GIBBARD informed CS-1 that he purchases the pills in large quantities from the TARGET SUBJECT. GIBBARD also informed CS-1 that he could have more pills "pressed" once his supply was exhausted. GIBBARD informed CS-1 that he resupplies his stock of pills with the TARGET SUBJECT biweekly.

11.     On or about July 6, 2015, CS-1 informed Task Force Officers that he/she had met GIBBARD at the gym earlier in the day. At that time, GIBBARD provided CS-1 with a sample of two pills. Task Force Officers arranged to meet CS-1 to collect the samples.

3

12.     The pills collected from CS-1 contained the marking "A/215" pressed on one side.  Task Force Officers immediately sent the sample pills to the Northeast Regional Laboratory ("NERL") for chemical testing.

13.     On July 9, 2015, NERL verbally informed Task Force Officers that the sample pills were not Oxycodone but rather Acetyl Fentanyl ("Fentanyl").

14.     On July 13, 2015 Task Force Officers received the official NERL report confirming that the pills contained Fentanyl.  According to NERL, Fentanyl is a Schedule I narcotic.  It is an extremely powerful opioid used in medical treatment.  Fentanyl is approximately 30 to 50 times more potent than heroin.

15.     On or about July 23, 2015, members of the DEA Tactical Diversion Squad conducted surveillance of a meeting between CS-1 and GIBBARD at the Club Fitness Gym ("Gym") located in Astoria, New York.  Prior to the meeting, Task Force Officers equipped CS-1 with an audio/video recording device.  The meeting had been arranged by CS-1 to discuss the potential sale of Fentanyl to CS-1.  At the meeting, GIBBARD agreed to sell 1,000 pills of Fentanyl to CS-1 at a date to be determined.

16.     On or about August 12, 2015 and upon the direction of Task Force Officers, CS-1 conducted a control buy of 500 pills of Acetyl Fentanyl from GIBBARD through an intermediary known to both CS-1 and GIBBARD.  GIBBARD had previously informed CS-1 that the pills would be provided on consignment.  CS-1 would provide the GIBBARD with $3,500.00 at a date to be determined.

17.     At the same meeting, GIBBARD also informed CS-1 that he recently had in his possession as many as 9,000 pills of 30mg Oxycodone.  GIBBARD informed CS-1 that 2,000 pills were to be sold that same night to another buyer.

18.     On or about August 19, 2015, CS-1 met GIBBARD and provided him with $3500.00.

19.     On or about September 21, 2015, Task Force Officers approached the intermediary known to both GIBBARD and CS-1 who participated in the August 12, 2015 controlled buy.  He/She agreed to cooperate with Task Force Officers and was subsequently signed up by the DEA as a confidential source (hereinafter "CS-2").

20.     CS-2 has made consensually monitored phone calls with GIBBARD and has provided Task Force Officers with text messages received from GIBBARD.

21.     For example, on or about September 28, 2015, CS-2 made a consensually monitored telephone call to GIBBARD:

CS-2:     So, yo, what's going on everyone's waiting for you?

GIBBARD:  What happened?

CS-2:     I said, were, I'm waiting for you what's the story?

GIBBARD:  I saw my friend, when was it?  Saturday

CS-2:     yeah

GIBBARD:  He's like, so, he like, still works that kid, he's got a real job, he makes fucking $5,000 dollars a week, He makes $5,000 dollars a week, legitimately.  He U/I; you know what I'm saying, he's an electrician, local 3, you know what I'm saying?

CS-2:     oh ok

5

GIBBARD:    So, it's like, It's like that, but it's like when its time its time, so you know what I'm saying, he can only do it at certain times.

CS-2:    oh, alright

CS-2:    What I'm saying is if it's an issue for him to get it going that many, like, I can break it up, you know what I'm saying?  It doesn't have to be in one shot, I would like it to be so I can get it over with, you know what I mean?

GIBBARD:    I got you, I'm backed, I'm backed up, for,  I'm backed up at least, how about this..I'm backed up three blocks.

CS-2:    Wow

GIBBARD:    okay

CS-2:    god, god bless you.

GIBBARD:    no joke  I'm backed up three; I'm backed up three blocks.

GIBBARD:    god bless you

GIBBARD:    seriously

CS-2:    that's crazy, unbelievable.  I didn't think that thing was going to go.

GIBBARD:    no, I'm backed up that much.  Three blocks.

CS-2:    alright, well as soon as ugh, you know, the traffic opens up, you know, just, I'll come right to you, just call me whenever.  Even if, like I said, even if it's not that, you know,  cause I know when you spoke to you know who, he wanted to,  you know, tell you, you know, it is what it is, you know?

GIBBARD:    yup

CS-2:    so even if its half, or a quarter, or whatever, I'll just, just let me know. I'll come right over.

6

GIBBARD:    you got it

CS-2:    alright brother be good, I'll talk to you soon

GIBBARD:    alright, bye

22.    CS-2 informed Task Force Officers that he understood GIBBARD's reference to his "friend" to be the TARGET SUBJECT, i.e. the individual who manufactures the Acetyl Fentanyl pills that GIBBARD distributes.  CS-2 also understood GIBBARD's statement that he was "backed up three blocks" to mean that GIBBARD owed pills to three other individuals before he could supply CS-2.

23.    CS-1 previously informed Task Force Officers that GIBBARD seeks a resupply of pills from the TARGET SUBJECT approximately biweekly.

24.    A review of a court-authorized pen register on GIBBARD's cellular telephone revealed that GIBBARD called the SUBJECT TELEPHONE approximately twice per week since July 14, 2015.  Moreover, the SUBJECT TELEPHONE is a prepaid cellular telephone.  Based on my training and experience, these type of cellular phones are sometimes referred to as "burner phones" in the criminal context and are commonly used to evade law enforcement detection.

25.    On or about October 15, 2015, GIBBARD informed CS-2 that pills had become available for CS-1 to purchase.  As with the first controlled buy, GIBBARD would only conduct the transaction using CS-2 as an intermediary.

26.    That same day, at the direction of Task Force Officers, CS-2 arrived at GIBBARD's residence and was provided with 2,200 pills.  CS-2 stated that he was interested

7

in purchasing 5,000 pills, to which GIBBARD replied, in sum and substance, that he would

look into the availability of additional pills.   CS-2 informed GIBBARD that he would return

shortly with CS-1's purchase money.   Task Force Officers supplied CS-2 with $13,500.00

which he delivered to GIBBARD later that evening.

   27. On or about October 16, 2015, at the direction of Task Force Officers,

CS-2 called GIBBARD and inquired about the availability of additional pills.   GIBBARD

stated, in sum and substance, that he would immediately call the TARGET SUBJECT to

discuss a resupply of pills.

   28. A review of the court-authorized pen register on GIBBARD's cellular

telephone revealed that shortly after speaking with CS-2, GIBBARD called the SUBJECT

TELEPHONE.

   29. Based on the above, there is probable cause to believe that the

TARGET SUBJECT is utilizing the SUBJECT TELEPHONE to conduct narcotics

transactions with MICHAEL GIBBARD.

   30. In my training and experience, I have learned that the Service Provider

is a company that provides cellular telephone access to the general public.   I also know that

providers of cellular telephone service have technical capabilities that allow them to collect

and generate at least two kinds of information about the locations of the cellular telephones

to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-

longitude data, and (2) cell-site data, also known as "tower/face information" or cell

tower/sector records.  E-911 Phase II data provides relatively precise location information